

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JILL OTIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 05 C 3694 |
| | ) |
| MICHAEL J. ASTRUE, | ) Magistrate Judge |
| Commissioner of Social | ) Arlander Keys |
| Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jill Otis asks this Court to enter summary
judgment in her favor, reversing the decision of the Commissioner
to deny her claim for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"); in the alternative, she
asks the Court to remand the matter to the Commissioner for
further proceedings. The Commissioner[1] has filed a cross-motion
for summary judgment, asking the Court to affirm the final
decision. For the reasons set forth below, the Court denies Ms.
Otis' motion, and grants the Commissioner's motion.

## I. Procedural History

Ms. Otis applied for DIB and SSI on April 3, 2002. R. at 83.
She alleged that she was disabled since July 8, 2001, due to

---

[1] On February 12, 2007, Michael J. Astrue took over as the new
Commissioner of the Social Security Administration. His name has been
substituted in for that of Jo Anne B. Barnhart, who served in that
capacity when this case was filed and whose name appeared on the
original complaint.

headaches and neck pain resulting from being hit by a four by
four; she later added depression and difficulty walking as
disabling impairments. R. at 35, 40, 83-85, 94, 248-49. The
Agency denied these applications initially on June 5, 2002, and
on reconsideration on October 25, 2002. R. at 30-39, 250-60.
Thereafter, on November 4, 2002, Ms. Otis requested a hearing
before an ALJ. R. at 40. The case was assigned to ALJ Edward
Pappert, who scheduled an administrative hearing for March 6,
2003. R. at 26-29. When Ms. Otis failed to appear on that date,
the ALJ dismissed her appeal and sustained the denial of
benefits. R. at 26-29. Ms. Otis then filed a request for review
of that dismissal order, stating she had changed addresses and
had not received the hearing notice; and, on July 19, 2003, the
Appeals Council reinstated the case for further proceedings. R.
at 54-60.

The case was reassigned to ALJ Pappert, who scheduled a
hearing for January 21, 2004. R. at 274-83. At that hearing, Ms.
Otis requested time to obtain an attorney, despite having signed
a waiver of her right to counsel, and the ALJ continued the
hearing to March 4, 2004. R. at 14, 71, 274-83. On that date, Ms.
Otis appeared, represented by counsel, and testified before the
ALJ; a vocational expert ("VE") testified as well. R. at 284-330.
On July 20, 2004, the ALJ denied Ms. Otis' applications for DIB

and SSI, finding that she was not disabled because she could perform her past assembly line work and a significant number of other unskilled, light jobs identified by the VE. R. at 11, 14, 21-22. Ms. Otis subsequently filed a Request for Review on October 2, 2004, but the Appeals Council denied her request on May 31, 2005, making the ALJ's decision the final decision of the Commissioner. R. at 4-10. Ms. Otis now seeks judicial review of the ALJ's decision.

## II. Factual Background

At the March 4, 2004 hearing before the ALJ, Ms. Otis testified to a number of physical ailments that prevent her from presently working and that have inhibited her past work efforts. R. at 290-314. She attributed her pain and suffering to a work-related accident in 1999 at a factory where she was making John Deere parts on an assembly line. R. at 294-95. She explained that she was removing plastic molds from the line when she dislocated her arm and injured her foot. R. at 295-96. Ms. Otis stated that she is right handed and that sometimes her hand swells up so much that she cannot even bend her fingers. R. at 303. In particular, she reported being unable to lift objects over seven pounds. R. at 304. She further testified that her right ankle swells up and that she can only stand for thirty to forty minutes at a time. R. at 291, 303, 307. She also stated that she can only walk about a

3

half a block before her ankle swells and she gets winded. R. at 311. Ms. Otis further explained that, despite having a driver's license, she is unable to drive due to her swollen foot. R. at 291, 293.

Ms. Otis testified that her last job was as a cashier at a convenience store, but she was forced to stop working due to back pains extending from her upper back to her buttocks. R. at 291, 294. Ms. Otis also testified that she is frequently overcome by headaches, which usually last all day but can last as long as two days. R. at 309. She further reported trouble turning her head from side to side and specifically said that she was unable to turn her head all the way over to her left shoulder. R. at 304- 05. Ms. Otis recounted that she previously worked at a healthcare center as a certified nursing assistant ("CNA"), a job that required lifting and was, therefore, impacted by her back pain as well. R. at 297. She also stated that she has held a number of cashiering and stocking jobs through temporary services that sent her to work at factories, K-Mart, Builder's Square, a Navy base, and several healthcare facilities. R. at 297-98. As to the latter, she noted that caring for the elderly caused strain and resulted in additional injury to her back. R. at 299. Ms. Otis testified that she also previously worked at White Hen, but only for a week because she could not get along with the people

4

working there. R. at 296-97.

Additionally, Ms. Otis explained that she does not sleep well at night, and spends her days in bed because of her back and foot impairments. R. at 293-94. She testified that, despite taking medication, the pain is still severe. R. at 294. She explained that, because of this pain, she goes to the doctor about every two weeks. R. at 299. Ms. Otis also stated that she cries every other day because she is depressed. R. at 312.

Ms. Otis further testified that she is single and lives with her two children, ages 14 and 1. R. at 292-93. She was 34 years old as of the date of the hearing. She explained that her aunt, who lives in Racine, Wisconsin, often visits to help her take care of herself and her one-year-old child. R. at 300-01. Ms. Otis, born March 6, 1969, stated that she is 5'7" and weighs approximately 240 lbs. R. at 290, 306. With respect to her education, she recounted that she left school in eighth grade when she was kicked out for fighting. R. at 292. She also noted that, while in school, she was placed in special classes because she was a slow learner and had behavioral problems. R. at 310.

Linda Gels, a vocational expert ("VE"), also testified before the ALJ at the March, 4, 2004 hearing. At the outset, VE Gels testified that, before taking the stand to testify, she had reviewed the record and had listened to Ms. Otis' testimony

5

before the ALJ. R. at 314-28. Thereafter, the ALJ posed the following question to the VE:

Assume we are to find from the record that I had a hypothetical claimant 35 years of age, education and past relevant work experience equivalent to the claimant [Ms. Otis]. Unable to lift and carry more than 10 pounds frequently or 20 pounds occasionally. Not able to work with ladder, ropes, scaffolding. May not [work] at unprotected heights either. Also, might not be able to understand, remember and carry out any detailed or complex instructions . . . might have a moderate limitation in the ability to work in coordination or close proximity to others without being distracted by them and also . . . would have a moderate limitation in the ability to get along with coworkers and would be markedly limited in the ability to interact appropriately with the general pub[l]ic. With those limitations could this hypothetical claimant perform any of the work identified for Ms. Otis?

R. at 319.

The VE responded that the hypothetical individual could perform unskilled, light jobs with some additional non-exertional impairments. R. at 319. She explained that the hypothetical individual would be precluded from working as a CNA because it is designated as semiskilled, and would likewise be precluded from working as a cashier because of her marked limitation in working with the general public. R. at 320. She noted, however, that the hypothetical individual would be capable of working as an assembly worker or housekeeper/cleaner because those occupations exist at the unskilled, light level and do not require working with the general public. R. at 320-21. She testified that there

6

are approximately 6,000 unskilled, light housekeeper/cleaner

positions in the nine counties that surround Cook County,

Illinois. R. at 321-22

The ALJ then added a few limitations to the hypothetical

before the VE:

> [A]ssume that the individual was unable to stand and walk
> for more than two hours total in an eight-hour workday
> not more than half an hour at a time and is unable to
> lift more than 10 pounds occasionally and is limited in
> the ability to reach overhead with the right dominant
> hand and arm such that would be precluded . . . from
> reaching overhead with the right dominant hand.

R. at 322. The VE responded that, with these additional

limitations, the claimant would be relegated to bench assembly—an

unskilled, sedentary job, for which there are approximately 3,000

positions in Cook County and the counties that surround it. R. at

322-23. Then, upon cross-examination by Ms. Otis' attorney, the

VE stated that, while she believed that some of these bench

assembly positions only require a reasoning level of one under

the general education development standard, she "wouldn't know

how to break[down]" the 3,000 positions between reasoning levels

one and two. R. at 326. The VE also stated that there are other

job categories, such as cashier, information clerk, and gate

attendant positions, for which there are 8,000 or 9,000 positions

in the region. R. at 326. However, the VE noted that the claimant

may not be able to perform those positions given her difficulties

7

in interacting with the general public. R. at 323.

Additionally, upon cross-examination by Ms. Otis' attorney, the VE testified that if the hypothetical individual had to lie down for an hour a day during the workday and outside of scheduled break time, then she would not be able to sustain competitive employment. R. at 324. She also explained that, if the claimant did not have good manual dexterity in the dominant hand, she would be limited in her ability to perform bench assembly work. R. at 325. The VE estimated that there are approximately 200 unskilled, sedentary jobs in the nine-county area surrounding Cook County. R. at 326.

In addition to the live testimony of Ms. Otis and the VE, the ALJ also had the opportunity to review the medical records and reports on file. In April and August 2002, Dr. Carl Lambiasi, Ms. Otis' treating physician, submitted neurological and psychiatric reports to the Bureau of Disability Determination Services ("DDS"). R. at 157-162, 189-91. Dr. Lambiasi specifically indicated that he had first examined Ms. Otis in March 2002 for flu symptoms, and that, thereafter in early April 2002, he had diagnosed her with anxiety disorder, obesity, and myalgia. R. at 136, 158. He also noted that Ms. Otis complained of headaches, on-and-off neck pain over the previous three years, and occasional difficulty sleeping; yet he concluded that Ms.

8

Otis had no impairment in activities of daily living, including working, and that she had a "normal ability" to do mental work activities, such as understand, carry out and remember instructions, and respond appropriately to supervision, co-workers, and customary work pressures. R. at 160-62, 191. Dr. Lambiasi further reported that Ms. Otis had no sensory or reflex changes, normal strength in her arms and legs, no atrophy or tremor, normal ambulation and the ability to walk more than fifty feet without assistance, unlimited ability to use her upper extremities to perform both gross and fine manipulations, no aphasia, full ability to communicate, and complete orientation. R. at 158-59.

Also, in April 2002, Dr. Harry Bergmann, a state agency physician, reviewed the medical evidence on file and completed a Physical Residual Functional Capacity Assessment of Ms. Otis. R. 164-173. Dr. Bergmann concluded that Ms. Otis should exercise caution when climbing ladders, ropes, and scaffolds due to her obesity and neck pain, but he found that she had no exertional, manipulative, visual, communicative, or environmental limitations. R. at 165, 167-70. Additionally, a state agency psychologist, Dr. Kirk Boyenga, reviewed the medical evidence in the case in May 2002. R. at 174-186, 193-95. Dr. Boyenga opined, in a Mental Residual Functional Capacity Assessment, that Ms.

9

Otis "could understand, remember, and carry out simple instructions (unskilled-type)," and should avoid work that required frequent/close contact with coworkers or the public. R. at 195. Dr. Boyenga further indicated, in a Psychiatric Review Technique form, that Ms. Otis had an anxiety disorder that produced mild restrictions in daily activities; marked difficulties in social functioning; mild deficiencies in concentration, persistence, or pace; and no episodes of decompensation. R. at 179, 184.

Thereafter, in September 2002, Dr. Roopa Karri examined Ms. Otis at the request of the DDS. R. at 197. Dr. Karri reported that Ms. Otis arrived at the examination in a wheelchair she had rented that day at the clinic, and that this made it difficult to assess whether Ms. Otis could walk without assistance. R. at 197, 200. Though Ms. Otis stated that that she could not walk 50 feet without support, Dr. Karri ultimately rejected this contention. R. at 199. In particular, Dr. Karri explained that Ms. Otis "was saying she cannot get up by herself from the wheelchair or walk by herself, but [that] she . . . must have walked by herself from the car to the clinic." R. at 197, 200. Dr. Karri's report further noted that during the examination Ms. Otis was only able to get on and off the exam table with the help of her cousin who had accompanied her to the clinic. R. at 199. Ms. Otis told Dr.

10

Karri that her cousin usually helps her with her daily
activities, including walking. R. at 197-99. She also said that
she could not clean, shop, cook, write, open jars, or tie her
shoes without assistance. R. at 198.

Dr. Karri additionally reported that Ms. Otis informed her
of a history of right-sided body pain and difficulty moving since
1988 or 1989, when she was hit in her head and face. R. at 197.
Ms. Otis stated that medications were not helping and that
sometimes she could not move due to muscles spasms. R. at 197.
Ms. Otis also indicated that her whole arm was numb on the right
side and that cold tended to aggravate the pain. R. at 197. Dr.
Karri observed that Ms. Otis was obese and winced with pain
throughout the exam. R. at 198. Dr. Karri also noted tenderness
in Ms. Otis' neck and right shoulder, with muscle spasms in the
right paraspinal region, hypotension, and limited range of motion
in her shoulders and cervical spine. R. 199-200. Dr. Karri
further reported that Ms. Otis' grip strength was moderately
decreased in her right hand. R. at 199. In addition, Dr. Karri
determined that Ms. Otis' memory, appearance, behavior and
ability to relate during the examination were all normal, and
that she showed no signs of depression, agitation, irritability,
or anxiety. R. at 199.

In October 2002, another state agency physician, Dr. George

11

Kudinka, reviewed the medical evidence on file and completed a Physical Residual Functional Capacity Assessment of Ms. Otis. R. 201-08. Dr. Kudinka determined that Ms. Otis had the following exertional and postural limitations: she could lift twenty pounds occasionally and ten pounds frequently; could stand and walk for six hours in the eight-hour work day; sit for about six hours in the eight-hour work day; had limited ability to reach overhead with her right arm; could never climb stairs, ropes, or scaffolds; and could occasionally climb ramps and stairs. R. at 202-04. Dr. Kudinka further reported that Ms. Otis had no manipulative, visual, communicative, and environmental limitations. R. at 204-05. He concluded that the severity of Ms. Otis' alleged symptoms was disproportionate to the expected severity based on her medically determinable impairments. R. at 206.

In addition to the DDS reports, the record also contains medical records from Ms. Otis' treating physicians. In particular, the record reveals that Ms. Otis had been under the rehabilitative care of chiropractor Ivan Bracic for an injury she sustained on June 25, 2003, while removing soft drink containers from a grocery display at the Gurnee Jewel Foods store. R. at 225. In his Final Evaluation Report, dated October 13, 2003, Dr. Bracic stated that Ms. Otis first came to his office on June 28,

12

2003, claiming that the display fell over and knocked her to the ground. R. at 225. She complained of intermittent neck, mid-back, and right foot pain, but denied any pain radiation, numbness or tingling. R. at 228. Dr. Bracic diagnosed her injuries as a cervical sprain/strain, thoracic sprain/strain, and right ankle sprain, and he prescribed physical therapy, which Ms. Otis received at his office. R. at 226. Dr. Bracic also noted that "[a]n exhaustive questioning of [Ms. Otis] did not reveal any new causation from either injury, disease or accident that was relative to home or work activities" and that therefore Ms. Otis did receive the injuries while grocery shopping. R. at 226. The record further indicates that Dr. Bracic permitted Ms. Otis to resume school attendance[2] effective July 1, 2003, three days after her first visit to his clinic. R. at 230. However, Dr. Bracic noted in his final report that Ms. Otis' symptoms "may remain dormant only to resume through insidious onset while performing normal activities of daily living," that she should be monitored closely, and that she may require future care to minimize her pain and suffering. R. at 227. In the subsequent months, Ms. Otis continued to visit Dr. Bracic's office and continued to complain of back and neck pain. R. 224-34.

---

[2] The Court assumes that this is a misprint and that Dr. Bracic really intended to indicate that Ms. Otis could return to work.

Additionally, the record contains patient progress reports from 2001 to 2004 recounting Ms. Otis' visits to family medicine practitioner Dr. David Alengo. R. at 235-46. In addition to treatment for upper respiratory infections, bronchitis, pharyngitis, and vaginitis, Dr. Alengo's notes memorialize his 2003 and 2004 examinations/diagnoses of Ms. Otis' shoulder, neck, and back pain. R. at 235-46.

On July 20, 2004, ALJ Pappert found that Ms. Otis was not disabled, and therefore not entitled to DIB and SSI. R. at 21-22. He determined that Ms. Otis was capable of performing her past work on the assembly line, in addition to other positions existing in significant numbers in the national economy, such as unskilled, light housekeeper/cleaner jobs. R. at 20-22.

### III. Standard of Review

In reviewing the ALJ's decision, the Court may not decide the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner, not the Court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to

14

that which he finds more credible). Rather, the Court must accept
findings of fact that are supported by "substantial evidence," 42
U.S.C. § 405(g), where substantial evidence is "such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion." *Herron*, 19 F.3d at 333 (quoting *Richardson v.
Perales*, 403 U.S. 389, 401 (1971)). This, however, does not mean
that the Commissioner (or the ALJ) is entitled to unlimited
judicial deference. *See Carlson v. Shalala*, 999 F.2d 180, 181
(7th Cir. 1993). The ALJ must sufficiently articulate his
assessment of the evidence to "assure [the Court] that the ALJ
considered the important evidence . . . [and to enable the Court]
to trace the path of the ALJ's reasoning." *Id.*; *see also Clifford
v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (ALJ must build "an
accurate and logical bridge" from the evidence to his
conclusion). When the ALJ fails to mention rejected evidence,
"the reviewing court cannot tell if significant probative
evidence was not credited or simply ignored." *Zblewski v.
Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) (holding that such
explanation is "absolutely essential for meaningful appellate
review").

Further, while the Court does not require a written
evaluation of every piece of testimony and evidence submitted, a
minimal level of articulation of the ALJ's assessment of the

15

evidence is required in cases in which considerable evidence is presented to counter the Agency's position. *Id.* at 78-79. And finally, the evidence supporting the Agency's decision must be substantial "when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [Agency's] view." *Id.* at 78 (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 472, 477-78 (1951)) (substantial evidence in favor of the Agency's decision cannot be determined in isolation from the aggregate record).

Although the plaintiff bears the burden of demonstrating her disability, "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (quoting *Smith v. Sec'y of HEW*, 587 F.2d 857, 860 (7th Cir. 1978)). "Failure to fulfill this obligation is 'good cause' to remand for gathering additional evidence." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (finding that, if the ALJ found the evidence before him insufficient, he should have obtained more evidence).

## IV. Social Security Regulations

To be eligible for disability benefits, a claimant must be found to be "disabled" within the meaning of the the Social Security Act (the "Act"). 42 U.S.C. § 423(a)(1)(E). The Act defines "disability" as the "inability to engage in any

16

substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last
for a continuous period of not less than 12 months." *Id.* at §
423(d)(1)(A). The Social Security Regulations prescribe a five-
step sequential analysis to determine whether a claimant is
disabled. 20 C.F.R. § 404.1520 (2006)(explaining inquiry for DIB
claims); 20 C.F.R. § 416.920 (stating identical inquiry for SSI
claims). The ALJ must consider whether the claimant: (1) is
presently employed; (2) has a severe impairment or combination of
impairments; (3) has an impairment that meets or equals any
impairment listed in the Regulations as being so severe as to
preclude gainful activity; (4) is unable to perform her past
relevant work; and (5) is unable to perform any other work
existing in significant numbers in the national economy. *Young v.
Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir.
1992); 20 C.F.R. §§ 404.1520, 416.920. A negative answer at any
step other than step three precludes a finding of disability.
*Young*, 957 F.2d at 389. The claimant has the burden of proof at
steps one through four. *Id.* If the claimant meets that burden,
the burden shifts to the Commissioner at step five to show that
the claimant has the ability to engage in other work existing in
significant numbers in the national economy. *Id.*

Step five of the ALJ's analysis typically involves an evaluation of the claimant's residual functional capacity ("RFC") to perform a particular category of work (i.e. sedentary, light, medium, heavy, or very heavy work), in combination with an application of the Medical-Vocational Guidelines (the "Grid") to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. See 20 C.F.R. § 404, Subpart P, Appendix 2. The Grid is a chart that classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the use of the Grid is appropriate, the Commissioner or ALJ may rely upon it for determining disability, and, in such a case, the Grid alone constitutes substantial evidence sufficient to uphold the decision of the Commissioner. *Id.* However, where a plaintiff suffers from significant non-exertional impairments, the ALJ may not rely upon the Grid. See Social Security Ruling ("SSR") 83-14. "When a plaintiff's non-exertional impairments significantly diminish his ability to work . . . the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which plaintiff can obtain and perform." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986).

Pursuant to the Regulations, The ALJ articulated his reasoning for denying Ms. Otis' claims for DIB and SSI using this five-step sequential analysis. R. at 15-22. At step one of the analysis, the ALJ concluded that there was no evidence that Ms. Otis has worked after July 8, 2001, the alleged onset date of disability in this case. R. at 15, 21. At step two, the ALJ determined that Ms. Otis does have "severe" impairments, as demonstrated in the record by the presence of "medically determinable" conditions that significantly limit her ability to perform basic work activities. R. at 15, 21.

At step three, the ALJ found that Ms. Otis' impairments, even in combination, do not meet or equal any of the impairments in Appendix 1 to Subpart P, Regulations No. 4. R. at 15, 21. Specifically, the ALJ explained that the criteria under § 1.02A were not satisfied because Ms. Otis' condition had not resulted in an inability to ambulate effectively (i.e. to walk without the use of a walker, two crutches, or two canes). R. at 15. Further, the ALJ noted that Ms. Otis' condition did not satisfy the criteria under § 1.2B because it did not involve one major peripheral joint in each upper extremity, resulting in an extreme loss of function of both upper extremities with an inability to perform fine and gross movements effectively. R. at 15. Moreover, even though Ms. Otis' mental condition had resulted in "mild"

19

restrictions of activity in maintaining concentration,

persistence, or pace, the ALJ explained that the criteria under §

12.06 were not satisfied because her condition had not resulted

in the complete inability to function independently outside of

her home. R. at 16.

Before proceeding to the remaining steps of the sequential

analysis, the ALJ evaluated Ms. Otis' RFC, pursuant to 20 C.F.R.

§§ 404.1445, 416.945, and concluded that her medically

determinable impairments precluded the following work-related

activity:

> [L]ifting more than 20 pounds occasionally or more than
> 10 pounds frequently; performing work around unprotected
> heights; climbing ropes, ladders, or scaffolds;
> understanding, remembering and/or carrying out detailed
> or complex instructions; moderately limited in the
> ability to work in coordination with or proximity to
> others without being distracted by them; moderately
> limited in the ability to get along with co-workers; and,
> markedly limited in the ability to interact appropriately
> with the general public.

R. at 16, 21. The ALJ explained his reasoning for the RFC

finding by providing an overview of Ms. Otis' symptoms,

impairments and limitations. R. at 16-20.

The ALJ explained that the objective medical

evidence—including Ms. Otis' 2002 emergency room visit for

pharyngitis; the 2002 medical reports from Dr. Lambiasi; the

September 2002 consultative internal medicine examination by Dr.

20

Karri; the November 2001 to January 2004, family medicine
progress records from Dr. Alengo; and the 2003 medical records
from Dr. Bracic—does not contain any opinions from treating or
examining physicians indicating that the claimant is disabled or
even has limitations greater than those determined by [the RFC
finding]." R. at 17-18. The ALJ stated that, if Ms. Otis was
truly disabled by her alleged impairments, "one might expect to
see more significant physical abnormalities," a different course
of treatment and use of medications, and some indication of
restrictions placed upon her by her treating doctors. R. at 18-
19. Instead, the record revealed that Ms. Otis' treatment "for
her alleged impairments has been essentially routine and/or
conservative in nature, and not generally the type of medical
treatment one would expect for a totally disabled individual." R.
at 19. Additionally, the ALJ pointed out that the conclusions of
the DDS consultant physicians also supported a finding of "not
disabled," though he did note that, because these physicians had
not examined Ms. Otis, their opinions did not as a general rule
warrant as much weight. R. at 18.

    The ALJ also considered Ms. Otis' testimony regarding her
symptoms and functional limitations, and concluded that these
were not overall inconsistent with the RFC finding. R. at 18-19.
The ALJ further determined that her complaints of disabling

                              21

symptoms and limitations were, in his words, "absolutely not credible" and "near[] the realm of absurdity." R. at 19, 21. Notably, the ALJ stated that:

> [Ms. Otis] exaggerated as to everything, especially pain and staying in bed all day, etc . . . alleged not being able to remember any other jobs and then admitted to at least six or more other jobs . . . [and] rented a wheelchair to go to the internal medicine consultative examination and there is nothing in the medical evidence to support such a need, nor her allegations that she has to hold on to someone else to walk.

R. at 19.

At step four, the ALJ concluded that Ms. Otis was capable of performing "past relevant work." R. at 20, 21. Specifically, the ALJ adopted the VE's testimony that, given the RFC finding, Ms. Otis could perform her past work on the assembly line. R. at 20. Furthermore, the ALJ concluded that, even if Ms. Otis were unable to perform her past relevant work, she could still perform other jobs in the national economy, and, therefore, the result would be the same under the last step of the sequential analysis. R. at 20. In particular, at step five, the ALJ found that the Commissioner could sustain the burden of identifying a significant number of other unskilled, light jobs that Ms. Otis could perform. R. at 20, 21. In making this determination, the ALJ used Medical-Vocational rule 202.17, and he also relied on the testimony of the VE- specifically providing the example of

22

the existence of 6,000 housekeeping positions in the State of
Illinois. R. at 20-21. Thus, the ALJ concluded that Ms. Otis is
not disabled for purposes of Titles II and XVI of the Social
Security Act, and accordingly not entitled to DIB and not
eligible for SSI. R. at 22.

## V. Discussion

Ms. Otis now appeals the ALJ's disability determination and
asks the Court to reverse or remand the Agency's final decision
because: (1) the ALJ failed to analyze significant evidence
favorable to Ms. Otis' claim when assessing her RFC, (2) the ALJ
improperly used hypothetical questioning of the VE to determine
Ms. Otis' ability to perform her past relevant work at step four
of the sequential analysis, as well as other work at step five,
and (3) the ALJ erred in finding that Ms. Otis could perform a
significant number of jobs existing in the national economy at
step five. See generally Pl.'s Mem. Supp. Mot. Summ. J. In
response, the Commissioner contends that the Court should affirm
the ALJ's decision because substantial evidence supported the
ALJ's RFC finding that Ms. Otis could perform a range of light
work, and because substantial evidence supported the ALJ's
finding that Ms. Otis could perform her past relevant work as an
assembly worker, as well as other work. See generally Def.'s Mem.
Supp. Comm'r's Decision. The Court will examine each of Ms. Otis'

arguments in turn.

A.    **The ALJ's Consideration of the Evidence**

Ms. Otis first argues that the ALJ disregarded favorable medical evidence and neglected to analyze the impact of her impairments on her ability to work. Pl.'s Mem. Supp. Mot. Summ. J. at 7, 9, 14. Specifically, she asserts that the ALJ's RFC assessment failed to properly consider her obesity and her marked physical limitations in moving her hands, neck, shoulders, and legs. Pl.'s Mem. Supp. Mot. Summ. J. at 7, 9, 14. The Commissioner responds that the ALJ did discuss all of the record evidence—Ms. Otis' complaints, as well as the medical records and reports; and that Ms. Otis ignores inconsistencies in her claims and the lack of medical support for her claims. Def.'s Mem. Supp. Comm'r's Decision at 8, 9, 11, 13-14.

The Seventh Circuit has consistently held that an ALJ must articulate his reasons for accepting or rejecting entire lines of evidence. *See, e.g., Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (failure to discuss plaintiff's headaches and blurred vision in reference to his ability to work); *Herron*, 19 F.3d at 333 (failure to provide any explanation for the rejection of plaintiff's subjective complaints of pain in his hands and fingers); *Young*, 957 F.2d at 392 (failure to discuss claimant's testimony, his wife's affidavits, or the reports of three

doctors); *Look v. Heckler*, 775 F.2d 192, 195 (7th Cir.1985)
(failure to discuss uncontradicted evidence consisting of
claimant's and friend's testimonies as well as medical reports);
*Zblewski*, 732 F.2d at 78 (failure to discuss subjective
complaints of pain supported by medical statements). While the
ALJ is not required to provide a written evaluation of each and
every piece of evidence or testimony in the record, he may not
selectively discuss only that evidence that favors his ultimate
conclusion. *Herron*, 19 F.3d at 333.

In addition, the ALJ should generally give controlling
weight to the treating physicians' opinions regarding the nature
and severity of a medical condition if it is well supported by
medical findings and not inconsistent with other substantial
evidence. *Clifford*, 227 F.3d at 870 (citing 20 C.F.R. §
404.1527(d)(2)). When denying controlling weight to the opinion
of a treating physician, the ALJ must minimally articulate his
reasons for doing so. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th
Cir. 2004); *see also Rice v. Barnhart*, 384 F.3d 363, 370-71 (7th
Cir. 2004)(approving of ALJ's decision to give less weight to
treating physician's opinions that were apparently "a recitation
of a claimant's subject complaints"); *White v. Barnhart*, 415 F.3d
654, 659 (7th Cir. 2005)(approving of ALJ's decision to give less
weight to treating physician's opinions that were influenced by

25

claimant's discredited subjective complaints and inconsistent with the opinions of examining physicians). Furthermore, when assessing the claimant's RFC, the ALJ must explain how he arrived at his conclusions by including "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts," pursuant to SSR 96-8p. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (quoting SSR 96-8p).

With these standards in mind, the Court will now consider Ms. Otis' claims that the ALJ failed to properly consider various lines of evidence relating to the impact of her obesity and the impact of her other physical limitations on her ability to work.

## 1. Ms. Otis' Obesity

Ms. Otis argues that the ALJ failed to analyze evidence of her obesity, both as its own disability and in combination with her other impairments, as required by SSR 02-1p. Pl.'s Mem. Supp. Mot. Summ. J. at 14. The Commissioner responds that the ALJ explicitly considered Ms. Otis' obesity in combination with her other impairments in making his RFC assessment, that he noted her weight and height, and that he relied on medical reports regarding her obesity. Def.'s Mem. Supp. Comm'r's Decision at 13-14.

SSR 02-1p instructs that an ALJ should consider obesity in determining whether a claimant has a medically determinable

impairment and whether the impairment is severe. SSR 02-1p. Though obesity is not considered a listing-level impairment, it may be considered a medically determinable impairment capable of affecting a claimant's disability determination, either by itself or in conjunction with other impairments. *Id.* Specifically, the ruling recognizes that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id.*

In reviewing the ALJ's obesity analysis, the Court does not substitute its judgment for the ALJ's judgment by deciding that Ms. Otis is *in fact* obese and that her impairments are *in fact* severe. *See Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). That is for the ALJ to determine. *See id.* Rather, the Court must determine whether the ALJ's decision enables the Court to trace the path of the ALJ's reasoning on the issue of obesity. *See Skarbek,* 390 F.3d at 504 (although the ALJ did not explicitly consider plaintiff's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions who were aware of plaintiff's obesity); *see also Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (even where obesity merely aggravates a disability caused by something else, obesity still must be considered for its incremental effect on that disability).

Here, the ALJ's decision demonstrates that he did build the

necessary "logical bridge" and that he analyzed Ms. Otis' obesity in compliance with SSR 02-1p. The ALJ explicitly indicated that he made his RFC finding upon considering "the entire record, including the claimant's allegations of disabling symptoms and limitations, *as well as the combined effects of obesity with the claimant's other impairments*." R. at 17 (emphasis added). While the ALJ's decision suggests that he only analyzed Ms. Otis' obesity *in combination* with her other impairments, and not as its *own* disability, the latter analysis would have been moot given the ALJ's ultimate finding of "not disabled." *See* SSR 2-1p (noting that combined effects of obesity with other impairments can be greater than each considered separately). In other words, if obesity was not a medically determinable impairment capable of affecting the disability determination when considered *in combination* with other impairments, then the claimant's obesity alone could not possibly be its *own* disability.

Furthermore, that statement regarding Ms. Otis' RFC was not the extent of the ALJ's obesity discussion. Rather, the ALJ explicitly noted Ms. Otis' height of 5'7" and her weight of between 220 and 240 lbs, and he further considered the notation by examining physician Dr. Karri that Ms. Otis was obese and winced with pain during the medical examination. R. at 17, 19. The ALJ, moreover, stated that his decision relied on the fact that "the

28

record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." R. at 18. Here, as in *Skarbek*, the ALJ evaluated the claimant's obesity as part of his consideration of the medical opinions provided by doctors who were aware of and familiar with her condition. *See* 390 F.3d at 504.

The remainder of the record bolsters the ALJ's conclusion regarding Ms. Otis' obesity. For instance, even though treating physician Dr. Lambiasi reported to DDS that Ms. Otis was obese, he indicated that she had no impairment in activities of daily living, including working. R. at 158, 162. An ALJ should especially give controlling weight to "[a] treating physician's opinion regarding the nature and severity of a medical condition . . . if it is well supported by medical findings and not inconsistent with other substantial evidence," and here that is the case. *Clifford*, 227 F.3d at 870 (citing 20 C.F.R. § 404.1527(d)(2)). Dr. Lambiasi's conclusion is consistent with the report from state agency physician Dr. Harry Bergmann, who acknowledged that Ms. Otis should exercise caution when climbing ladders, ropes, and scaffolds due to her obesity and neck pain, but determined that she had no exertional, manipulative, or environmental limitations. R. at 165, 167-70. In short, the Court can trace the ALJ's reasoning on this

issue, and thus finds that the ALJ properly articulated his analysis of Ms. Otis' obesity, pursuant to SSR 02-1p, and sufficiently considered this important evidence in making his RFC assessment, pursuant to SSR 96-8p.

## 2. Ms. Otis' Other Physical Limitations

Next, Ms. Otis asserts that ALJ Pappert disregarded other favorable medical evidence and failed to consider all of her physical impairments in his RFC assessment. Pl.'s Mem. Supp. Mot. Summ. J. at 7, 9; Pl.'s Reply Br. Supp. Mot. Summ. J. at 1. In particular, she contends that the ALJ's RFC finding ignored the decrease in the range of motion of her shoulder and cervical spine, the moderate decrease in her grip strength, the decreased sensation in her right hand and leg, and her limited reach. Pl.'s Mem. Supp. Mot. Summ. J. at 7, 9; Pl.'s Reply Br. Supp. Mot. Summ. J. at 1. The Commissioner responds that Ms. Otis ignores the ALJ's credibility determination and the lack of medical support for these claims. Def.'s Mem. Supp. Comm'r's Decision at 8, 13.

Indeed, the ALJ's RFC assessment must be based on *all* of the relevant evidence in the record, including, among other things, the claimant's medical history and medical signs and findings, in addition to medical source statements. SSR 96-8p; *see also Keys v. Barnhart*, 430 F. Supp. 2d 759, 773 (N.D. Ill. 2006) (where ALJ

failed to articulate her analysis of claimant's medical history and the medical signs and findings supporting claimant's alleged limitations). And, in particular, the ALJ should discuss grasping impairments because problems manipulating objects by hand reduces the number of jobs available to a disability applicant. *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (ALJ erred by ignoring claimant's propensity to drop objects due to the tingling in his hands). The ALJ must also consider subjective complaints of pain if supported by medical signs and findings. *See Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992); *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985) (decision must be based on testimony and medical evidence in the record; ALJ "cannot make his own independent medical determination about the claimant").

In this case, the ALJ did consider all of the record evidence of Ms. Otis' purported physical limitations, including both the medical reports and Ms. Otis' subjective complaints, when the ALJ made his RFC assessment. *See* R. at 17-19. The ALJ stated that the 2002 reports from treating physician Dr. Lambiasi revealed that Ms. Otis had normal ability to use her upper extremities to perform both gross and fine manipulations, and that she had no impairment in activities of daily living. R. at 17. The ALJ further considered treating physician Dr. Alengo's

family medicine progress records from 2001-2004 that disclose
that Ms. Otis had a history of neck pain.[3] R. at 18. In addition,
the ALJ pointed to the 2003 reports from Dr. Bracic, which reveal
that Ms. Otis received conservative physical therapy for
occasional neck/mid-back/right foot pain. R. at 18. The ALJ
further considered the 2002 consultative internal medical
examination with Dr. Karri, where Ms. Otis complained of right-
sided neck pain with muscle spasms, right arm pain with numbness,
spasms in her right leg and right hand and pain walking. R. at
17. The ALJ also noted Dr. Karri's findings that Ms. Otis
demonstrated limited range of motion in her shoulders and neck.
R. at 17. Finally, the ALJ outlined Ms. Otis' own testimony where
she indicated pain and swelling in her right hand and severe neck
pain that often prevents her from turning her head. R. at 18-19.

---

[3] The record before the Court also includes determinations by Dr.
Alengo, made in September and December 2004, that Ms. Otis was unable
to work due to the severity of her neck problems. R. at 263, 268. The
Court will not consider these prescription pad notations because they
were transcribed several months after the ALJ's unfavorable decision
in this case. *See Rice*, 384 F.3d at 366 ("Although technically a part
of the administrative record, the additional evidence submitted to the
[Court] . . . cannot now be used as a basis for a finding of
reversible error"). Moreover, Dr. Alengo's conclusion that Ms. Otis
cannot work was not self evident from his earlier examinations and
nothing in the record indicates that this determination was
forthcoming. Also, despite making initial arguments that the ALJ
improperly ignored these prescription pad notations, Pl.'s Mem. Supp.
Mot. Summ. J. at 8, Ms. Otis later recognized her error and thereafter
withdrew her contention, Pl.'s Reply Br. Supp. Mot. Summ. J. at 2. As
such, the Court shall not engage in any further discussion of this
additional evidence.

Following this summary and review of the record, the ALJ explained how it factored into his decision. R. at 18-19. The ALJ stated that, if Ms. Otis was truly disabled by her alleged impairments, "one might expect to see more significant physical abnormalities," a different course of treatment, and some indication of restrictions placed upon her by her treating doctors. R. at 18. Instead, he found that Ms. Otis' treatment "has been essentially routine and/or conservative in nature" and that her use of medications did not suggest the presence of a more limiting impairment than found in his decision. R. at 19. The ALJ indicated that the DDS reports likewise supported a finding of "not disabled." R. at 18.

What is more, the ALJ explained that his consideration of the evidence was greatly influenced by his determination that Ms. Otis was "absolutely not credible [because] . . . [s]he exaggerated as to everything, especially pain and staying in bed all day." R. at 19. Though Ms. Otis is not contesting the ALJ's credibility assessment, Pl.'s Reply Br. Supp. Mot. Summ. J. at 4, the ALJ's credibility determination nonetheless warrants considerable discussion here because it goes directly to the weight the ALJ gave to the favorable medical evidence in the record. *See also* SSR 96-7p (a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case

33

record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight").

In particular, the ALJ found Ms. Otis' complaints to be significantly out of proportion to the medical evidence, and he explained that her need for a wheelchair during the consultative examination with Dr. Karri "nears the realm of absurdity." R. at 18-19. Specifically, Dr. Karri expressed her difficulty in assessing Ms. Otis' impairments because, for instance, even though Ms. Otis told Dr. Karri that she "cannot get up by herself from the wheelchair or walk by herself . . . she rented a wheelchair from the clinic and she must have walked by herself from the car to the clinic." R. at 200. Additionally, even though Ms. Otis told Dr. Karri that she cannot walk 50 feet without support, Dr. Karri rejected this complaint and concluded that Ms. Otis can walk that distance without assistance. R. at 199. Given Dr. Karri's finding that Ms. Otis went so far as to fake the need for a wheelchair, and to otherwise exaggerate her physical limitations, the ALJ's credibility determinations were not over the top, and the Court will not disturb them. *See Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002) (generally courts will not disturb an ALJ's credibility findings unless they are patently wrong).

Also tending to call Ms. Otis' credibility into question is the fact that she told Dr. Karri in September 2002 that her impairments precluded her from shopping, yet she claimed she was hurt while grocery shopping in June 2003.. R. at 198, 225. The findings of Dr. Karri's 2002 medical examination are again significantly tempered by the 2002 report from Ms. Otis' own treating physician, Dr. Lambiasi, that concluded that Ms. Otis had no impairment in activities of daily living, including working. R. at 17. Moreover, state agency physician Dr. Kudinka reviewed the record and determined that the severity of Ms. Otis' alleged symptoms was disproportionate to the expected severity based on her medically determinable impairments. R. at 206. In short, Ms. Otis' credibility truly permeates this entire case, and evinces why the ALJ did not give as great weight to Dr. Karri's notations regarding Ms. Otis' limitations and impairments when he analyzed the evidence in the record and ultimately arrived at his RFC assessment.

The ALJ's credibility determination is further supported by the fact that the record remains absolutely void of any medical reports prior to 2001, and empty of any documents of Ms. Otis' purported disabling impairments prior to April 2002, when Dr. Lambiasi concluded she had no impairment in functioning. This is particularly suspect given Ms. Otis' statements to Dr. Karri that she had a history of right-sided body pain and difficulty moving

since 1988 or 1989 when she was hit in her head and face, given Ms. Otis' testimony at the March 4, 2004 administrative hearing that her pain and suffering was caused by a 1999 assembly line accident, and given Ms. Otis' disability report where she states she was disabled since 2001 when she was hit by a four-by-four. R. at 94, 197, 294-95. Ms. Otis' claimed onset date is further suspect because of chiropractor Dr. Bracic's 2003 statement that "[a]n exhaustive questioning of [Ms. Otis] did not reveal any new causation from either injury, disease or accident that was relative to home or work activities" and that therefore, Ms. Otis did receive the injuries while grocery shopping. R. at 226. Hence, the record clearly reveals that throughout the course of this case, Ms. Otis has neither been able to pinpoint specific causes of her impairments, nor remained consistent with her stories of pain, suffering, and limitations in working and daily living. While the Court has great difficulty tracing Ms. Otis' complaints of her disabling impairments, the Court has no trouble tracing the ALJ's analysis of the significant evidence regarding Ms. Otis' ability to use her hands, neck, shoulders, and legs.

In sum, the ALJ built an accurate and logical bridge from the evidence to his RFC assessment. See Clifford, 227 F.3d at 872. The Court is satisfied that the ALJ did not improperly disregard favorable evidence regarding Ms. Otis' obesity and other alleged

36

physical limitations, and finds that the ALJ's RFC assessment comports with SSR 96-8p.

## B. The ALJ's Hypothetical Questioning of the VE

Ms. Otis further contends that the ALJ improperly used hypothetical questioning of the VE to determine at step four of the sequential analysis whether she could perform her past assembly line work, and to determine at step five whether she could perform other work existing in significant numbers in the national economy. Pl.'s Mem. Supp. Mot. Summ. J. at 11-12. The Commissioner responds that Ms. Otis' argument is unavailing because: the VE testified to Ms. Otis' ability to perform her past assembly line work immediately after hearing Ms. Otis testify to the requirements of that work; the VE's analysis was consistent with the *Dictionary of Occupational Titles* ("*DOT*") and *Selected Characteristics of Occupations* ("*SCO*"); and the ALJ's hypothetical included all of Ms. Otis' credible limitations. Def.'s Mem. Supp. Comm'r's Decision at 14-16.

At steps four and five of the sequential analysis, the ALJ must consider the claimant's RFC, an assessment of what work-related activities the claimant can perform despite her limitations. *Young*, 362 F.3d at 1000-01; *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); 20 C.F.R. § 404.1545(a)(1). Under the rules governing SSI and DIB, a claimant who can perform

"past relevant work" is not entitled to benefits. 20 C.F.R. §§ 404.1520(f), 404.1560(b)(3); *see Smith*, 388 F.3d at 252. "Past relevant work" is defined as substantial gainful employment that the claimant had performed, in the not too remote past, and for long enough to have learned how to do it. 20 C.F.R. §§ 404.1560(b)(1), 404.1565(a)). In determining whether a claimant is entitled to benefits, the ALJ cannot simply describe the claimant's job in a generic way (i.e. "sedentary") and conclude, on the basis of the claimant's residual capacity, that she can return to her previous work. *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984); *see also Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991). Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these occupational tasks. *Strittmatter*, 729 F.2d at 509; *see also* SSR 82-62 ("Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work"). If the ALJ determines at step four that the claimant cannot perform past relevant work, then, at the fifth and last step of the sequential analysis, the ALJ must determine whether the claimant can perform other work existing in significant numbers in the national economy, based

38

upon his RFC assessment and the claimant's age, education, and work experience. 20 C.F.R. § 404.1520.

In general, the Seventh Circuit has held that hypothetical questions posed to a VE is a proper method for determining a claimant's work ability at steps four and five, where the hypothetical includes *all* the claimant's limitations supported by medical evidence in the record. *See, e.g., Young*, 362 F.3d at 1003 (noting the importance of the VE understanding the full extent of claimant's disability so as not to declare claimant capable of undertaking which he cannot truly perform). However, such hypotheticals do not always need to include every physical limitation, provided that the VE had the opportunity to learn of the applicant's limitations through, for example, an independent review of the medical records or through other questioning at the hearing. *Id.* The Seventh Circuit has held in many cases that imputing knowledge to the VE of everything in the exhibits and testimony from the hearing will be sufficient to allow an ALJ to assume that the VE included all of these limitations in assessing the applicant's ability to perform past relevant work and other jobs as well.[4] *See, e.g., Ragsdale v. Shalala*, 53 F.3d 816, 820-

---

[4] The Seventh Circuit is not unique in its conclusion that an incomplete hypothetical question may be cured by a showing that prior to testifying the VE reviewed the claimant's record containing the omitted information. *See, e.g., Williams v. Shalala*, 997 F.2d 1494 (D.C. Cir. 1993) (where one of the crucial matters omitted from ALJ's hypothetical questions was claimant's age, the court recognized that

39

21 (7th Cir. 1995); *Herron*, 19 F.3d at 337; *Cass v. Shalala*, 8
F.3d 552, 556 (7th Cir. 1993). For instance, in *Cass*, where the
ALJ's hypothetical question to the VE excluded some of the
claimant's non-exertional impairments, the court held that the
VE's testimony still constituted "substantial evidence" because
the VE reviewed the medical reports before giving his assessment.
8 F.3d at 556. Similarly, in *Herron*, where the ALJ failed to
include the claimant's complaints of drowsiness, finger
immobility, and sensitivity to air conditioning in his
hypothetical to the VE, the court affirmed the ALJ's decision
because the VE testified that he had reviewed the medical record
before the hearing. 19 F.3d at 337. In that case, as here, the
claimant's attorney further expanded the record by posing
additional hypotheticals to the VE that included the claimant's
other non-exertional impairments. *Id.*

It is true, as Ms. Otis contends, that, in making his step
four finding, the ALJ did not himself provide a detailed
discussion of the requirements of Ms. Otis' past relevant work
and then compare those requirements to her functional
limitations. But, such a discussion was unnecessary in this case
because the ALJ adopted the VE's testimony, which considered the
requirements of Ms. Otis' past assembly line work and her ability
_____
the VE could obtain such information by reviewing the administrative
record).

40

to now perform that work. R. at 20. At the March 4, 2004
administrative hearing, Ms. Otis testified that the requirements
of her 1999 assembly line work included standing for long periods
of time and taking parts off the line in 100 degree heat. R. at
295. Based upon this testimony, the VE testified that assembly
jobs range from sedentary and up; that she understood Ms. Otis to
have engaged in minimum light assembly line work because she was
standing throughout the day; and that she presumed that Ms. Otis
performed her past assembly work at the unskilled level. R. at
316. The VE further testified that there are bench and small
products assembly jobs that are considered unskilled, light work.
R. at 321. Also, as the Commissioner points out, the VE's
analysis properly relied on the *DOT* and the *SCO* in order to
determine Ms. Otis' ability to engage in her past relevant work.
*See* SSR 82-62 (providing that in cases where past relevant work
is at issue, such supplementary and corroborative information
from other sources such as employers, the *DOT*, etc on the
requirements of the work as generally performed in the economy
may be used). Thus, because the VE's testimony considered how Ms.
Otis' past relevant assembly job was typically performed and
compared it to Ms. Otis' RFC, the ALJ did not need to himself
provide a detailed discussion of the requirements of Ms. Otis'
past assembly line work, and he, therefore, reasonably relied

upon the VE's testimony in formulating his step four finding.

Furthermore, like the ALJs in *Cass* and *Herron*, the ALJ
properly used hypothetical questioning of the VE to assess Ms.
Otis' ability to perform her past assembly line work at step
four, and her ability to perform other work at step five. *See
Cass*, 8 F.3d at 556; *Herron*, 19 F.3d at 337. In posing the
question to the VE, the ALJ requested that Ms. Otis' age,
education, work experience, and limitations be considered in
determining Ms. Otis' work ability. R. at 319. The ALJ's
hypothetical barred work with ladders, scaffolds, or roofs, and
it was limited to an individual who was unable to understand,
remember or carry out any detailed or complex instructions. R. at
319. Furthermore, the question contemplated an individual with a
marked inability to interact appropriately with the general
public. R. at 319. It is true, as Ms. Otis points out, that the
ALJ's hypothetical did not specifically address a "limited range
of motion in the shoulders and cervical spine, and a moderate
decrease in grip strength in the right hand." Pl.'s Mem. Supp.
Mot. Summ. J. at 12. But, as the Commissioner explains, and as
the Court discussed above, the ALJ did not find these to be
credible limitations, given the lack of supporting medical
evidence in the record, and given his determination that Ms. Otis
exaggerated her symptoms and frequently contradicted herself. *See*
R. at 19.

Indeed, credibility permeates this entire case and demonstrates the weight that the ALJ gave to the record evidence in order to ultimately make his disability determination. Because the ALJ determined that Ms. Otis was not credible, he did not give substantial weight to the findings of Dr. Karri's consultative examination, which include, for example, the finding that Ms. Otis had limited range of motion in her shoulders and cervical spine. *See* R. at 19. Notably, the ALJ's review of Dr. Karri's medical findings was tempered by the suspicion that Ms. Otis went out of her way to rent a wheelchair simply for the purpose of the DDS exam—an action that Dr. Karri herself found to be outrageous enough that she included it in her DDS report, and an action that the ALJ ultimately determined substantially tainted Dr. Karri's conclusions. *See* R. at 19, 197, 200.

Moreover, even if the ALJ's hypothetical questioning failed to include every limitation, the VE's assessment of Ms. Otis' RFC would still be proper because the VE independently reviewed the case file prior to the hearing and listened to Ms. Otis' testimony. *See* R. at 315. Thus, the VE had a complete picture of Ms. Otis' impairments, even if the ALJ did not specifically mention them all. *See Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992); *Young*, 362 F.3d at 1003 (where the hypothetical does not include all of the

applicant's limitations, there must be some amount of evidence in the record indicating that the VE knew the extent of the applicant's limitations). Nothing in the record suggests that the VE was unable to understand the medical reports, unfamiliar with them, or remiss in considering all of the information at her disposal. Rather, as in *Cass*, the VE's testimony in this case constitutes "substantial evidence" to support the ALJ's determination and provided a reliable assessment of which jobs would be appropriate for Ms. Otis. *See* 8 F.3d at 556.

This assessment is buttressed by the fact that both the ALJ and Ms. Otis' attorney actually posed to the VE additional hypotheticals containing those additional limitations Ms. Otis now contends the ALJ overlooked. *See Herron*, 19 F.3d at 337. For instance, on cross-examination, Ms. Otis' attorney expanded the ALJ's hypothetical to involve an individual who had to lie down for an hour a day during the workday outside of scheduled break time. R. at 324. In response, the VE stated that, with these additional limitations, such an individual would not be able to sustain competitive employment. R. at 324. Though it is true that the ALJ did not specifically reject these additional limitations in his decision, the record is silent as to any medical evidence to support these limitations, aside from Ms. Otis' subjective complaints about spending her days in bed because of her back and

foot impairments. *See* R. at 293-94. And, the ALJ specifically
indicated that he gave nominal weight to these complaints because
he found that Ms. Otis was "absolutely not credible . . . [and
that she] exaggerated as to everything, especially pain and
staying in bed all day." R. at 19. The Court therefore finds no
error in the ALJ's use of hypothetical questioning to determine
Ms. Otis' ability to perform her past assembly line work at step
four of the sequential analysis, as well as other work at step
five.

## C.   The ALJ's Determination of the Number
of Jobs Existing in the National Economy

Next, Ms. Otis argues that the ALJ improperly determined, at
step five of the sequential analysis, that she could perform a
significant number of jobs existing in the national economy.
Pl.'s Mem. Supp. Mot. Summ. J. at 12. Specifically, Ms. Otis
contends that the ALJ's finding that she could not understand,
remember and/or carry out detailed tasks was inconsistent with
his finding that she could perform work as a housekeeper. Pl.'s
Mem. Supp. Mot. Summ. J. at 12. She asserts that such a
limitation indicates that she is only capable of performing jobs
assigned a reasoning level one in the *DOT* and not reasoning level
two jobs. Pl.'s Mem. Supp. Mot. Summ. J. at 12-13. She further
points out that the VE did not break down the 6,000 housekeeping
jobs existing in the region between reasoning levels one and two,

45

and that the ALJ did not make a specific finding with respect to
the number of level one jobs available. Pl.'s Mem. Supp. Mot.
Summ. J. at 12-13; *see* R. at 326. In response, the Commissioner
notes that Ms. Otis cites no authority to support her claim, and
argues that the VE's testimony supports the conclusion that there
are thousands of jobs existing in the national economy for a
person limited to unskilled, light work. Pl.'s Reply Br. Supp.
Mot. Summ. J. at 15-16.

At step five of the sequential analysis, the burden shifts
to the Commissioner to show that Ms. Otis has the ability to
engage in other work existing in significant numbers in the
national economy, given her physical and mental abilities and
vocational qualifications. *See 20 C.F.R.* §§ 404.1566(b),
416.966(b); *see also Zurawski v. Halter,* 245 F.3d 881, 886 (7th
Cir. 2001). This burden is not met if a VE testifies that a
claimant has skills that can be transferred to only an
insignificant number of jobs, *see Beeler v. Bowen,* 833 F.2d 124
(8th Cir. 1987) (claimant was limited to about 10 jobs in the
county, approximately 50 in the state, and only about 5,000
nationally); nor is the burden met where a VE's testimony is
based on a job classification that is broader than the work for
which the claimant is qualified, *see Bjornholm v. Shalala,* 39
F.3d 888 (8th Cir. 1994) (cannot conclude that appropriate

sedentary jobs exist based upon statistics for light-exertion classifications).

In this case, the VE first testified that there are approximately 6,000 unskilled, light housekeeper/cleaner jobs existing in Illinois, and then she outlined several other possible job positions that Ms. Otis was capable of performing. R. at 321-23, 326. For example, after the ALJ added additional limitations to his initial hypothetical, the VE responded that the claimant could perform bench assembly—an unskilled, sedentary job, for which there are about 3,000 positions in Cook County and the counties that surround it. R. at 322-23. The VE also testified that there are other job categories, such as cashier, information clerk, and gate attendant positions, for which there are 8,000 or 9,000 positions in the region (though the VE did note that the claimant may not be able to perform these jobs, given her difficulty in interacting with the general public). R. at 323, 326. Additionally, in response to new hypothetical limitations posed by Ms. Otis' attorney on cross-examination, the VE estimated that there are approximately 200 unskilled, sedentary jobs in the nine-county area surrounding Cook County. R. at 326.

It is true that the VE never broke down the number of any of these potential job positions between reasoning level one and

47

reasoning level two. Neither the ALJ nor Ms. Otis' attorney requested such a breakdown. Ms. Otis' attorney did ask the VE to break down the 3,000 unskilled, sedentary bench assembly jobs between reasoning level one and reasoning level two, and the VE responded that she was unable to do so. R. at 326. Nevertheless, in concluding "that there are a significant number of jobs remaining in the economy that the claimant can perform [such as the following unskilled, light jobs existing in the State of Illinois: housekeeper (6,000)]," the ALJ failed specifically to account for the reasoning level limitation. R. at 22 (bracketed material in original).

According to the *DOT*, a reasoning level of one requires an individual to "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." U.S. Department of Labor, *Dictionary of Occupational Titles—Appendix C* (4th ed., 1991), (hereinafter "*DOT, Appendix C*"). In comparison, a reasoning level of two requires an individual to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." *Id.* Despite the *DOT*'s distinction between reasoning levels one and two, the Court

finds that the evidence and testimony in this case support a
finding that Ms. Otis could work as a housekeeper/cleaner at
either of the two reasoning levels. In particular, the ALJ's RFC
finding only precludes Ms. Otis from work that requires
"understanding, remembering and/or carrying out *detailed or
complex instructions.*" R. at 16, 21 (emphasis added). The RFC
finding does not state that Ms. Otis is unable to "[a]pply
commonsense understanding to carry out *detailed but uninvolved .
. . instructions.*" *DOT, Appendix C, supra* (emphasis added). It
would seem that "detailed or complex instructions" are farther
along the spectrum of difficulty than are "detailed but
uninvolved . . . instructions." *See* R. at 16, 21; *DOT, Appendix
C, supra.* Thus, it was not necessary for the ALJ to distinguish
between reasoning level one positions and reasoning level two
positions, since the RFC finding suggests that Ms. Otis could
perform either. Such a finding would also be supported by the
evidence from Ms. Otis' own treating physician, Dr. Lambiasi, who
concluded that she had a "normal ability" to do mental work
activities, such as understand, carry out and remember
instructions, and respond appropriately to supervision, co-
workers, and customary work pressures. R. at 162, 191. Likewise,
state agency physician Dr. Boyenga determined that Ms. Otis
"could understand, remember, and carry out simple instructions

49

(unskilled-type)," and he further indicated that she only had mild deficiencies in concentration, persistence, or pace. R. at 184, 195. The Court accordingly finds that the ALJ did not err at step five of the sequential analysis when he concluded that Ms. Otis could perform a significant number of jobs existing in the national economy, and when he pointed to the 6,000 unskilled, light housekeeper positions in the region as an example of such work.

Moreover, even if Ms. Otis was limited to jobs at reasoning level one, there would still be a significant number of jobs available for her, according to the VE. Whether the breakdown between reasoning level one and level two jobs means a cumulative 50% reduction in reasoning level one housekeeper/cleaner positions in the State of Illinois (3,000 jobs), a 90% reduction (600 jobs), or even a 95% reduction (300 jobs), a significant number of housekeeping jobs would still exist. See Dudley v. Shalala, 1993 WL 186078, *2 (7th Cir. June 1, 1993) (finding it inconsequential whether VE meant a cumulative 50%, 90%, or 95% reduction of jobs when explaining that additional mental shortcomings would eliminate one major category of jobs and substantially diminish the number of jobs claimant could perform); Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993) (finding that 1,400 job positions constituted a significant

50

number of jobs, and referencing several cases from other circuits where between 174 jobs and 1,350 jobs constituted significant numbers). What's more, the ALJ's step five finding cites these housekeeping positions as just one example of the type of work that Ms. Otis could perform at the unskilled, light level. R. at 22. The VE testified to thousands of other positions that Ms. Otis would be capable of performing. R. at 322-23, 326.

Finally, even if the Court was persuaded that the ALJ's step five finding was deficient, it would nonetheless decline to remand the case given the ALJ's step four finding that Ms. Otis can perform her past assembly line work. As explained above, the Court finds no error with the ALJ's conclusions at step four. Thus, returning this case to the ALJ for additional analysis at step five would not change the ultimate denial of Ms. Otis' claims for DIB and SSI. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *see also Dudley*, 1993 WL 186078 at *2 ("Returning this case to the ALJ for another opinion on the current record would be an exercise in formality").

## VI. Conclusion

For the reasons set forth above, the Court affirms the

51

Commissioner's decision denying Ms. Otis' claims for DIB and SSI.
Accordingly, the Court denies Ms. Otis' Motion for Summary
Judgment and grants the Commissioner's Cross-Motion for Summary
Judgment.

Dated: April 30, 2007

E N T E R:

ARLANDER KEYS
United States Magistrate Judge